THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CENTRAL GREYHOUND LINES, INC., and WILLIAM MOASCH, Appellants.

Court of Special Sessions of City of New York, Appellate Part, First Department, September 12, 1939.

*Bernard Sobol,* for the appellants.

*William C. Chanler, Corporation Counsel* [*Edward J. McGratty, Jr.,* of counsel], for the respondent.

BAYES, Ch. J. Appeal by defendants from judgment entered April 14, 1939, in the City Magistrates' Court of the City of New York, Seventh District, Manhattan, convicting them of a violation of section 436–2.0 of the Administrative Code of the City of New York for failure of defendant corporation to obtain, pursuant to

subdivision c, paragraph 3 of said section, a license from the hack bureau of the city of New York for its bus which was being operated under special charter agreement from New York city to Millerton, N. Y., and return, and for failure of the individual defendant, Moasch, driver of the bus, to obtain, pursuant to subdivision f, paragraph 17 of said section, a driver's license from said bureau.

Defendant Moasch, on August 3, 1938, was driving a bus of defendant corporation, which was under contract with the Children's Aid Society of New York for the transportation of passengers from 217 Sullivan street, New York city, to Millerton, N. Y., and return. The contract, People's Exhibit 1, is on a printed form issued by defendant corporation, having in its upper left-hand corner the words " Greyhound Lines " and in the center at the top the words " Chartered Service Order." The distance between the starting and terminating points is approximately 100 miles.

Section 436–2.0 of the Administrative Code provision was enacted by the board of aldermen in 1937 as chapter 27-a of the New York City Code of Ordinances. This was shortly prior to the enactment of the Administrative Code which is to be found in chapter 929 of the Laws of 1937, effective January 1, 1938. Subdivision c, paragraph 3, provides for the licensing of taxicabs, coaches, horse-drawn cabs and sight-seeing buses through the hack bureau of the police department of the city of New York. The license fee for each sight-seeing bus is fixed at twenty dollars and for each driver one dollar with renewals at fifty cents. The pertinent provisions of the said Code are as follows:

" b. Definitions:

" 2. The following are the defined terms of various expressions used under this section: * * *

" (p) ' Sightseeing bus ' shall mean a motor vehicle designed to comfortably seat and carry eight or more passengers operating for hire from a fixed point in the city of New York to a place or places of interest or amusement, and shall also include a vehicle, designed as aforesaid, which by an oral or written contract is let and hired or otherwise engaged for its exclusive use for a specific or special trip or excursion from a starting point within the city of New York.

" c. Requirements.

" 3. A taxicab, coach, horse drawn cab or sightseeing bus shall operate for hire within the city of New York only if the owner shall first have obtained an appropriate license from the hack bureau. Such license shall be issued as of April first and shall expire on the March thirty-first next succeeding, unless sooner suspended or revoked by the commissioner.

" 4. Fees. The license fee for each taxicab or coach shall be ten dollars, provided, however, that if the license is granted after October first, the fee shall be five dollars. The license fee for each horse drawn cab shall be five dollars, but if granted after October first the fee shall be two and a half dollars. For each sightseeing bus the license fee is fixed at twenty dollars, provided, however, that if the license is granted after October first the fee shall be ten dollars. * * *

" f. Driver's licenses and duties.

" 17. Requirements.— A person shall drive a taxicab, coach, horse drawn cab or sight-seeing bus within the City of New York only after having obtained a hack driver's license from the hack bureau."

The corporate defendant operates 216 buses and employs 500 drivers, having specified routes in the States of New York, New Jersey, Pennsylvania, Ohio, Massachusetts and Connecticut and makes use of any of its buses and drivers that may be available for the purpose of special charter parties. All of these buses, including the one in question, are inspected by the New York State Transit Commission. The particular bus with which we are here concerned carried license plates issued by the States of New York and Pennsylvania as well as by the Interstate Commerce Commission. At the time of his arrest the individual defendant driver stated he was going to cross the George Washington Bridge on his way to Millerton, N. Y., via New Jersey. It appears that after the issuance of the summons the driver followed a route lying wholly within the State of New York.

Upon this appeal defendants-appellants contend that the Administrative Code, section 436-2.0, above referred to, is void in that it violates section 54 of the Vehicle and Traffic Law, as well as the Public Service Law of the State of New York in so far as it purports to regulate omnibuses operating in the State of New York, and is unconstitutional and void in that it violates the interstate commerce clause of the Federal Constitution.

While the case is not free from difficulties, we have reached the conclusion that section 436–2.0 of the Administrative Code of the City of New York does not apply to the type of bus with which we are here concerned and accordingly the judgment of conviction should be reversed and the complaint dismissed as to both defendants.

A reading of section 436–2.0 as a whole discloses a comprehensive plan for the licensing and regulation of " taxicabs, coaches, horse-drawn cabs, and sightseeing buses." Subdivision a, paragraph 1, consists of legislative findings respecting the taxicab industry *in the city of New York*, stressing conditions requiring regulation. This section also declares that there is necessity for " some form of

mild regulation " for the " coach, horse-drawn cab, and sight-seeing bus business *in the city of New York*" which is stated to be " vested with a public interest." Paragraph 2 of subdivision 6 defines various expressions used in the section, including " commissioner," *i. e.*, police commissioner *of the city of New York*, etc., " hack bureau " as designating a bureau of the police department *of the city of New York*, " taxicab " as meaning a vehicle for hire *in the city of New York*, " taximeter " as a mechanical instrument or device approved by the hack bureau, " owner " as applied to a taxicab, or taxicabs, coach or coaches, horse-drawn cab or cabs, and sight-seeing bus or buses, " drivers " as applied to a taxicab, coach, horse-drawn cab or sight-seeing bus *in the city of New York*, " taxicab license," " coach license," " horse-drawn cab license " and " sight-seeing bus license " being such as are issued by the hack bureau. Then follow definitions of " medallion," " driver's license," " hack badge," " rate card," " hack stand," " expressage," " coach," " horse-drawn cab," and " sight-seeing bus." Paragraph 3 of subdivision c requires the owner of a taxicab, coach, horse-drawn cab or sight-seeing bus to obtain a license from the hack bureau as a preliminary to operating for hire *within the city of New York*. The subsequent subdivisions of paragraph c cover fees, and applications for licenses, including additional licenses, licenses for sight-seeing buses, coach licenses, transfer of taxi licenses, replacement of unsafe taxicabs, sale of repossessed taxicabs, operation by purchaser of taxicab and fee as applied to involuntary transfers of taxicabs. Paragraph 10 of subdivision c relates to type and manner of affixing medallions and paragraph 11 of subdivision c prescribes limitations upon the issuance of additional licenses by the hack bureau, including the manner of conducting public hearings in reference thereto. Paragraphs 12 and 13 of subdivision d relate to inspections and specifications as applied to taxicabs, coaches or horse-drawn cabs and sight-seeing buses, such inspections to be conducted by the hack bureau. Subdivision e relates to rates of fare and contains three paragraphs, Nos. 14, 15 and 16, prescribing fixed fares for taxicabs, the display of taxicab rates and omitting prescribed rates as applied to sight-seeing buses; also the commissioner is given power to prescribe appropriate forms of rate cards and driver's identification cards. Subdivision f contains twelve paragraphs numbered from 17 to 28, inclusive, relating to hack drivers' licenses, condition of licensing drivers, the examination of drivers, display of drivers' badges, renewal of hack drivers' licenses, fees for drivers' licenses, duties of hack drivers, unlawful agreements by drivers with hotels, restaurants, etc., settlement of fare disputes, suspension or revocation of drivers' licenses, carrying of packages, miscellaneous duties as applied to owners of licensed

vehicles and unlawful agreements by owners with hotels. Subdivision g relates to owner's duties. Subdivision h contains four paragraphs, numbered 31, 32, 33 and 34, which deal with color schemes and emblems and the authorization for the use thereof. Subdivision i consists of three paragraphs, numbered 35, 36 and 37, relating to hack stands and applications for the establishment thereof. Subdivision j contains two subdivisions, numbered 38 and 39, dealing with licenses for selling and manufacturing of taximeters. Subdivision k contains two paragraphs, numbered 40 and 41, relating to the suspension or revocation of the license of a driver of a taxicab, horse-drawn cab, or sight-seeing bus where the driver has failed to comply with any of the provisions of section 436–2.0. The final subdivision, 1, contains four paragraphs, numbered 42, 43, 43-a and 44, providing for the enforcement and penalties under the section by the commissioner, the hack bureau and the police department of the city of New York. The foregoing resumé covers all the paragraphs and subdivisions of section 436–2.0.

It will be noted that nowhere in section 436–2.0 is there specific reference to a " chartered bus." Nevertheless it must be admitted that the language of subdivision b, paragraph 2, subparagraph (p), in defining a sight-seeing bus as a vehicle " which by an oral or written contract is let and hired," etc., is, standing alone, broad enough to include the bus in question. We are of the opinion, however, that the language, " operating for hire from a fixed point in the city of New York to a place or places of  *  *  *  amusement," should, in the light of section 436–2.0, considered as a whole, be construed to refer to places of amusement within the city of New York. Likewise, and for the same reason, the language, " shall also include a vehicle, designed as aforesaid, which by an oral or written contract is let and hired or otherwise engaged for its exclusive use for a specific or special trip or excursion from a starting point within the city of New York," should not be construed to include a trip of the type in question with a terminal point 100 miles distant from the city of New York. It is clear that the vehicle with which we are here concerned is not in fact a " sight-seeing " bus in the ordinary sense of the term. It is nothing more nor less than a bus under contract or charter for transportation of a party of thirty odd persons from a point within New York city to a point without and return.

If we are correct in the views hereinabove expressed, it is unnecessary to consider the effect of section 54 of the State Vehicle and Traffic Law, the Public Service Law of the State, or the interstate commerce clause of the Federal Constitution. We may say, how-

ever, that there appears to be a serious question as to whether the provisions of section 436–2.0, if construed as the respondent contends, do not violate section 54 of the State Vehicle and Traffic Law. It is conceded of course that if the business of the corporate defendant were to be regarded, when taken as a whole, as being predominantly and essentially interstate in character, the provisions here involved could not be applied. We refrain from reviewing the numerous cases cited in the briefs of both appellants and respondent, many of which are interesting and pertinent to the points urged. Accordingly the judgment should be reversed and the complaint as applied to each defendant dismissed.

SALOMON and DOYLE, JJ., concur.